IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2024-NMCA-060

Filing Date: May 31, 2024

No. A-1-CA-40209

STATE OF NEW MEXICO,

  Plaintiff-Appellant,

v.

JOHN MARLOWE DAVIDSON,

  Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**R. David Pederson, District Court Judge**

Margaret McLean, Special Counsel
Santa Fe, NM

for Appellant

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellee

OPINION

**YOHALEM, Judge.**

**{1}** The State of New Mexico appeals the district court's dismissal with prejudice of second degree murder charges against Defendant John Marlowe Davidson as a sanction for multiple violations of the district court's discovery orders, rules, and the State's constitutional pretrial obligations. The State focuses its appeal exclusively on the final violation by the State: what the district court found was the intentional, reckless, or grossly negligent "loss" of a surveillance video that would have provided irreplaceable material evidence in support of Defendant's claim that he acted in self-defense. The State argues that its loss of this evidence must be addressed by one of the two remedies suggested by our Supreme Court in *State v. Chouinard* when evidence is inadvertently lost prior to trial. 1981-NMSC-096, ¶¶ 22-23, 96 N.M. 658, 634 P.2d 680.

We do not agree with the State that *Chouinard* limits the sanctions available to the district court for the repeated, intentional and highly prejudicial violations of court orders, rules, and constitutional pretrial duties by the State in this case. We, therefore, conclude that the district court did not abuse its discretion in relying on its inherent authority to dismiss with prejudice as a sanction in response to the prosecution's repeated violation of the court's discovery orders; the prosecution's eavesdropping on Defendant's privileged communications with his counsel and then failing to disclose its recordings of these conversations; the prosecution's failure to disclose exculpatory information, as required by *Brady v. Maryland*, 373 U.S. 83 (1963); and the prosecution's dishonesty in an attempt to cover up this misconduct. Because the district court's order was an appropriate exercise of the court's discretionary authority, we affirm.

**BACKGROUND**

**{2}** The State charged Defendant in this case with second degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994); and shooting at or from a motor vehicle (great bodily harm), contrary to NMSA 1978, Section 30-3-8(B) (1993). The charges arose from an incident on August 20, 2020, which ended with Defendant fatally shooting Justin Tapaha (Victim).

**{3}** Defendant claimed that he shot Victim in self-defense. In a recorded 911 call Defendant made seconds after the shooting, Defendant told the dispatcher he had stopped to talk to a man who he thought he knew. The man, who it turned out he did not know, reached into Defendant's car through the open window and tried to open the door. Defendant told the police when they arrived that Victim had almost grabbed Defendant's gun scaring "the hell" out of him, and that Defendant fired in self-defense.

**{4}** There were at least two businesses along Airport Drive, where the shooting occurred, that had surveillance cameras that filmed the encounter. The police collected a surveillance video from one of the businesses, Airport Auto, the day after the shooting. The video was taken from a distance and some of the events were partly shielded by parked cars along the curb, limiting its value. Victim's movements could be seen, as well as the movements of Defendant's car, but not the faces of either Defendant or Victim. The video shows Defendant's car driving on Airport Drive, Defendant slowing and stopping near where Victim was walking on the sidewalk, Victim approaching Defendant's car, the car darting forward and stopping, Victim approaching the car window, and then Victim falling to the ground as the car again lurches forward a few feet. Defendant is then shown getting out of his car and approaching Victim, who remains on the ground, and immediately making the call to 911. Defendant paces as he talks to the 911 dispatcher until police arrive.

**{5}** The video from another business, the Sundowner Mobile Home & RV Park (Sundowner), was of much higher quality than the Airport Auto video. It was collected by the police about a week after the shooting. The Sundowner video allowed the viewer to zoom in on the faces of Defendant and Victim and showed a clear view of the encounter.

**{6}**     The police interviewed a mother and son who had driven by just before the shooting. They told police that they heard Victim angrily and loudly yelling at Defendant. The mother heard Victim using "angry words" despite having a hearing impairment. The son heard Victim shouting that he was going to kill Defendant and Defendant's mother.

**{7}**     Following the shooting, Defendant was taken to the police station and put in an interview room with a hidden video camera and audio recorder. Defendant, who had been asking to be permitted to call his attorney since police arrived at the scene of the shooting, was then given a cell phone and a number to make that call. Defendant called his attorney multiple times. On one occasion, an officer specifically assured Defendant and his attorney that they were not being monitored or recorded. The police, however, had in fact monitored all of the calls and recorded most of them. A number of officers listened to Defendant's discussion with his attorney from the room next door.

**{8}**     On August 27, 2020, a week after the shooting, a pretrial detention hearing was held. The only recording given to Defendant's counsel prior to that hearing was the Airport Auto video. No transcript or recording of Defendant's 911 call was provided, although it is undisputed that the prosecution was aware of the call before the hearing. No lapel video recording of Defendant's statement to the police when they arrived on the scene was provided, nor were the lapel videos of the interviews conducted by the police with the mother and son who had witnessed the interchange between Defendant and Victim just prior to the shooting disclosed, although the district attorney admitted that these were in the hands of the police prior to the pretrial detention hearing.

**{9}**     The State argued at the pretrial detention hearing that the Airport Auto video showed that Defendant had been looking for someone to shoot; that the person shot was a stranger to Defendant; and that the video showed Defendant could have driven away, but chose to stay and shoot a stranger without any provocation. None of the information from the 911 call and the interviews that was supportive of Defendant's self-defense claim was brought forward at that hearing. The district court ordered that Defendant remain in pretrial custody based on the State's interpretation of the events on the Airport Auto video.

**{10}**     On December 1, 2020, new counsel for Defendant filed a motion to reconsider Defendant's pretrial detention, as well as a motion to compel discovery and certification of disclosure. The defense argued that the State had intentionally failed to disclose the contents of Defendant's 911 call, in which Defendant explained that he had tried to get away and his car had stalled, and that Victim was reaching for Defendant's gun when Defendant shot him; the police interview with the witnesses who reported that they heard Victim loudly threatening Defendant prior to the shooting; or the lapel videos of the twelve or more officers involved in the case, which would have included the lapel video of Defendant's statement to police. Defendant also alleged that they had become aware that police had improperly listened to and recorded Defendant's conversations with his counsel; that the prosecutor was aware that this had happened; and that the prosecution had failed to disclose the existence of those recordings to defense counsel. The motion to compel discovery alleged that much of this exculpatory material and other

discoverable information in the hands of the police and the prosecutor had not been turned over to the defense, in violation of the rules of criminal procedure, Rule 5-501(A) NMRA, and *Brady*.

**{11}**   On December 30, 2020, the district court granted Defendant's motion to compel discovery, ordering the production of responses to defense counsel's discovery requests, and reminding the prosecution that they not only have a duty to turn over all exculpatory material, but to actively search to determine whether there is exculpatory evidence in the State's possession. The district court ordered all discoverable materials turned over to the defense within seven days, and reminded the prosecution that failure to comply with the court's order would subject the State to sanctions including "witness exclusion, dismissal of the case, and/or other sanctions as justice so requires."

**{12}**   Discovery provided following the entry of the district court's order compelling discovery included the police recordings of Defendant's phone calls with his first attorney. Depositions taken of Farmington Police Department (FPD) officers by the defense revealed that seven or eight officers had listened to all or parts of Defendant's telephone calls with his counsel. The district attorney admitted in deposition testimony that he had been present at the police station and had done nothing about the officers eavesdropping on what Defendant had been told was a confidential telephone call with his attorney, other than to tell the officers to stop recording. He admitted that he did not intervene or check to ensure that the recording stopped, nor did he do anything to prevent officers from listening to the conversations.

**{13}**   The district attorney testified that he had not played the recordings, but admitted he could not be sure no one in his office had listened to them. Citing extensive case law condemning violation of a defendant's attorney-client privilege by the prosecution, and arguing that such misconduct impaired Defendant's Sixth Amendment right to counsel and to a fair trial, the defense sought dismissal of the charges.

**{14}**   After an evidentiary hearing, the district court found that "[m]ultiple [police] officers eavesdropped on the phone conversations Defendant . . . had with his original attorney." The court also found that the FPD had an official policy of recording suspects in their interview room, "including the recording of conversations between criminal defendants/suspects [*for years*]." The district court concluded that the eavesdropping by the officers on attorney-client privileged conversations violated Defendant's rights under the Fourth, Fifth, and Sixth Amendments of the United States Constitution and Article II, Sections 10, 14, 15, and 18 of the New Mexico Constitution and jeopardized Defendant's right to a fair trial. The district court further found that "[s]evere sanctions [were] warranted against the State for the above[-]referenced constitutional violations of Defendant's [r]ights." The court also found that information that could only have come from Defendant's conversations with counsel appeared in multiple police reports and the affidavits for search warrants, and that Defendant "suffered actual prejudice by extensive pretrial incarceration, which would have been avoided if the local [district attorney] had promptly disclosed to the [d]efense the eavesdropping scenario."

**{15}** Finding that there was no way to determine what illegally obtained information about legal strategies and defenses may have been shared within the prosecutor's office, the district court considered dismissing the case with prejudice, the remedy sought by the defense. Finding dismissal too harsh a sanction given the serious nature of the charges, the court instead required the district attorney to withdraw from the case, and ordered that the case would proceed with a different district attorney's office or the appointment of a special prosecutor. The court also suppressed the recordings of the attorney-client conversations, and the material improperly seized from Defendant's cell phone, as well as all related evidence. Defendant's motion to suppress the Airport Auto video as a sanction was denied by the district court.

**{16}** Following an article about the case in the *Farmington Daily Times*, defense counsel represented that he was told by two individuals, Jonathan and Cameron Tankersley, employees at the Sundowner, that they had provided the police with video from the Sundowner's surveillance cameras a week after the shooting. The Sundowner video had not been disclosed by the prosecution to Defendant, nor had the prosecution disclosed that Jonathan Tankersley had watched the video before turning it over to police, and was therefore a potential witness. It was undisputed that the Sundowner video, with its zoom capabilities and better vantage point, was far superior to the Airport Auto video, and that it revealed information about the encounter helpful to Defendant's claim of self-defense.[1]

**{17}** After speaking to the Tankersleys, defense counsel filed a second motion to dismiss the charges. In this motion, Defendant notified the district court that the defense had discovered the existence of the Sundowner video, and alleged that the FPD had collected the video approximately one week after the shooting incident. Defendant also argued that the video had never been disclosed to the defense. The video had since been recorded over by the Sundowner surveillance system and was no longer available from the Sundowner.

**{18}** Defendant argued that the State had intentionally violated both the district court's December 30, 2020, order compelling discovery and the requirement of due process to disclose exculpatory evidence under *Brady* by failing to turn over the video to the defense. Defendant's renewed request for the sanction of dismissal with prejudice also relied on the previous prosecutorial misconduct in eavesdropping on Defendant's telephone conversations with his counsel, and failing to disclose the recordings of these telephone calls. In response, the State claimed that the police department had never collected the Sundowner video from the Tankersleys.

**{19}** The district court held an evidentiary hearing on Defendant's second motion to dismiss on December 14, 2021. The court first heard the testimony of Officer Gensen, an FPD officer who testified to discovering the existence of the Sundowner video in a conversation with the Tankersleys; to a text exchange she had with Detective Adegite,

---

[1]Jonathan Tankersley testified that he had watched the video, which was in high definition, and that he was able to see Victim's demeanor, mannerisms, and body movements in the moments prior to the shooting. Mr. Tankersley stated that he could not clearly see any facial features without zooming in.

the lead detective on the case, about whether he wanted her to collect a copy of the Sundowner video; to the detective's positive response by text; and to the actions she took to get the Sundowner video downloaded onto a thumb drive and bring it to the FPD. Officer Gensen's testimony was supported by her body camera footage, and by screen shots of her text exchange with Detective Adegite. These texts were not included in the police report written by Detective Adegite denying that the FPD ever had possession of the Sundowner video.

**{20}** The district court next heard the testimony of the Tankersleys, who confirmed that they had told Officer Gensen about the Sundowner video, that she had asked them to make a copy on a thumb drive she provided, that they had done so, and that she picked up the thumb drive and turned it over to the FPD the next day.

**{21}** The district court also heard the testimony of Detective Adegite, who testified that he could not recall whether he had been contacted by Officer Gensen, or whether he received the video. He also testified that Officer Gensen had told him that she had never collected the Sundowner video because it did not provide "a clear vantage of the incident."

**{22}** The district court entered an order granting Defendant's second motion to dismiss on January 14, 2022. The court found that Detective Adegite's claims that he did not recall being contacted by Officer Gensen and did not receive the thumb drive were not as credible as Officer Gensen's testimony to the contrary. The court also found that Detective Adegite's supplemental police report, in which he represented that Officer Gensen told him the Sundowner video was not from a clear vantage point and that she did not collect it, was "seriously flawed." The district court found that the police department had in fact collected the Sundowner video, and the FPD had "either intentionally disposed of the thumb drive or at a minimum recklessly or grossly negligently lost it."

**{23}** Noting that this was the third time the district court had been asked to sanction the State for *Brady* or discovery violations, the court applied the framework set out in our Supreme Court's decision in *State v. Le Mier*, 2017-NMSC-017, ¶ 15, 394 P.3d 959, and *State v. Harper*, 2011-NMSC-044, ¶ 19, 150 N.M. 745, 266 P.3d 25, and concluded that the culpability of the prosecution, the prejudice to Defendant, and the absence of effective lesser sanctions required dismissal with prejudice. The State appeals.

## DISCUSSION

**{24}** The State argues that the district court abused its discretion in relying on its inherent authority to dismiss this case with prejudice.

### I. The District Court Was Not Restricted by *Chouinard* to Lesser Sanctions

**{25}** The State contends that, because the misconduct that immediately precipitated the dismissal was the loss or destruction of the Sundowner video, the district court was

limited to imposing one of the two remedies for lost evidence adopted by our Supreme Court in its decision in *Chouinard*, 1981-NMSC-096, ¶ 23. Those two remedies were (1) excluding all of the evidence that the lost video might have impeached; or (2) admitting the contents of the lost evidence through a witness, with full disclosure of the circumstances of its loss to the jury. *See id.*

**{26}** We do not agree with the State's claim that the district court was restricted to imposing one of the two *Chouinard* remedies for the lost evidence in this case. First, *Chouinard* involved the inadvertent loss of evidence, not an intentional or bad faith loss or destruction of evidence or a circumstance where the prejudice to the defendant arising from the absence of the evidence denies them a fair trial. 1981-NMSC-096, ¶¶ 14, 15 (finding federal court decisions refusing "to impose sanctions where the loss was inadvertent and not deliberate or in bad faith, and there was not such prejudice to the defendant as to deny [them] a fair trial" well-reasoned and persuasive (internal quotation marks and citation omitted)).

**{27}** Our Supreme Court in *Chouinard* does not attempt to limit the use of sanctions, including the sanction of dismissal with prejudice, when "[t]he [s]tate either breached some duty or intentionally deprived the defendant of evidence," or where material evidence has been suppressed and "[t]he suppression of this evidence prejudiced the defendant." *Id.* ¶ 16 (internal quotation marks and citation omitted); *see also id.* ¶ 14 (noting that our Supreme Court "indicated that . . . sanctions should be imposed on the [g]overnment for bad faith suppression of evidence" (internal quotation marks and citation omitted)). The question addressed by our Supreme Court in *Chouinard* is posed by the Court as follows: "Even with the best of procedures, evidence may sometimes be lost as it was here. In such instances, what should be done?" *Id.* ¶ 22.

**{28}** The district court found the FPD and the State "profoundly culpable for the 'loss' of crucial objective evidence favorable to the [d]efense." The district court also found that the evidence is material to the defense, that "the prejudice to . . . Defendant [from its loss] is significant," and that "[n]o other sanction would protect the [d]ue [p]rocess and [f]air [t]rial [r]ights of . . . Defendant." Therefore, the remedies identified by our Supreme Court in *Chouinard* are not controlling.

**{29}** Perhaps more importantly, the district court's dismissal of this case is based on repeated, intentional violations of the district court's plain and unambiguous discovery orders, of the disclosure requirements in our rules of criminal procedure, and of the disclosure required by both the state and federal constitutions. The loss or destruction of the Sundowner video was merely the final straw in the district court's analysis of the repeated, intentional violations by the State. The district court noted at the outset of its order granting Defendant's second motion to dismiss that "[t]his is the third time the [c]ourt has been asked to sanction the State for *Brady* or [d]iscovery violations." Under these circumstances, the district court correctly applied the standards set by our Supreme Court in *Harper*, 2011-NMSC-044, *as modified by Le Mier*, 2017-NMSC-017, for sanctioning intentional and prejudicial violations of discovery rules and orders.

**{30}** The question for our review, therefore, is whether the district court abused its discretion under *Harper*, 2011-NMSC-044 and *Le Mier*, 2017-NMSC-017, when it dismissed this case with prejudice.

## II.      The Standard of Review

**{31}** We review a district court's imposition of any sanction, including the ultimate sanction of dismissal with prejudice, for an abuse of discretion. *See Le Mier*, 2017-NMSC-017, ¶ 22. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *Id.* (internal quotation marks and citation omitted). When reviewing for an abuse of discretion, we view "the evidence—and all inferences to be draw from the evidence—in the light most favorable to the district court's decision." *Id.* Our Supreme Court, in *Le Mier*, reminds us that "the task of a reviewing court considering a trial court's discretionary determination is not to second-guess the decision, but only to ensure that the trial court made a principled exercise of its discretion." *Id.* ¶ 17 (internal quotation marks and citation omitted).

## III.      The District Court Did Not Abuse Its Discretion in Dismissing This Case With Prejudice

**{32}** Our Supreme Court addressed in *Harper* the circumstances under which a district court can resort to the extreme sanction of dismissal. 2011-NMSC-044, ¶ 16. Holding that "[e]xtreme sanctions such as dismissal are to be used only in exceptional cases," our Supreme Court provided three factors, which a district court must consider before imposing such a severe sanction: (1) the culpability of the offending party, (2) the prejudice to the opposing party, and (3) lesser sanctions. *Id.* ¶¶ 16, 19 (internal quotation marks and citation omitted). *Harper* notes that "the refusal to comply with a district court's discovery order only rises to the level of exclusion [of witnesses] or dismissal where the [s]tate's conduct is especially culpable, such as where evidence is unilaterally withheld by the [s]tate in bad faith, or all access to the evidence is precluded by [s]tate intransigence." *Id.* ¶ 17. Even when the State "has acted with a high degree of culpability," dismissal is an appropriate sanction only "where the opposing party suffered tangible prejudice," from missing evidence that is "important and critical to the case." *Id.* ¶ 19 (internal quotation marks and citation omitted). Finally, *Harper* directs the district court to consider whether a lesser sanction can be effective, urging our district courts "to apply sanctions that affect the evidence at trial and the merits of the case as little as possible." *Id.* ¶ 16 (internal quotation marks and citation omitted).

**{33}** After *Harper*, our Supreme Court provided in *Le Mier* that the district court "must evaluate the considerations identified in *Harper*—culpability, prejudice, and lesser sanctions—when deciding whether to exclude a witness [or dismiss a case with prejudice,] and must explain [its] decision . . . within the framework articulated in *Harper*." *Le Mier*, 2017-NMSC-017, ¶ 20. While *Le Mier* clarified that *Harper* does not stand for the proposition that "witness exclusion [or dismissal with prejudice are] justified only if all of the *Harper* considerations weigh in favor of exclusion," *Le Mier* is unequivocal in its requirement that a district court consider and address the *Harper*

factors on the record. *Le Mier*, 2017-NMSC-017, ¶ 20; *see also State v. Lewis*, 2018-NMCA-019, ¶ 12, 413 P.3d 484 ("*Le Mier* requires the district court to not only weigh the degree of culpability and extent of prejudice, but also explain its decision regarding applicability of lesser sanctions on the record.").

**{34}** We, therefore, review the district court's decision dismissing this case, discussing each of the *Harper* factors—as modified by *Le Mier*—and considering the district court's assessment of each, beginning with culpability. *See Harper*, 2011-NMSC-044, ¶ 19.

## A. Culpability

**{35}** In *Le Mier*, our Supreme Court emphasized the mandatory nature of court orders, stating that "[p]arties must obey discovery orders" and explaining that "[o]ur system of justice would be neither orderly nor efficient" if parties were not held to comply with those orders. 2017-NMSC-017, ¶ 24. Although a failure to obey a discovery order always involves some culpability on the part of the disobeying party, "[t]he degree of culpability, however, is a fact-specific inquiry for the district court to consider in assessing sanctions against a party. It is through this consideration of degree that bad faith or intransigence now factors into a district court's calculation of appropriate sanctions." *Lewis*, 2018-NMCA-019, ¶ 13.

**{36}** This case, like *Le Mier*, involves multiple violations of the district court's discovery orders. The district court noted at the outset of its order granting Defendant's second motion to dismiss that the court had already been asked twice before to sanction the State for *Brady* and discovery violations, and had twice imposed lesser sanctions. The district court held on December 30, 2020, that the State had failed to comply with the court's discovery order and with the discovery requirements of the rules of criminal procedure. The court entered an order compelling production of the withheld documents within seven days, and warned the State that further violations of its discovery obligations would result in sanctions, including, if necessary, dismissal with prejudice.

**{37}** When the documents were produced, Defendant discovered that the officers, under the eye of the district attorney, had eavesdropped on confidential attorney-client communications, and that the State had relied on those communications to obtain an order improperly holding Defendant in pretrial detention. The State had done so without disclosing the recordings it had made of these conversations to the defense. Although the district court found violations of its discovery orders and of Defendant's constitutional right to counsel by the State, and concluded that "[s]evere sanctions are warranted against the State for the above[-]referenced constitutional violations of Defendant's [r]ights," the court hesitated to impose the ultimate sanction of dismissal. The district court instead required the district attorney's office to withdraw, and ordered that the prosecution continue with substitute counsel to avoid the use of tainted evidence derived from the eavesdropping that may have been reviewed by prosecutors.

**{38}** The circumstances surrounding the Sundowner video was the third time the district court would sanction the State. The court found that the FPD had known about

the existence of the Sundowner video, and that the FPD had possession of it "from the moment Officer Gensen got the thumb drive" of the Sundowner video a week after Defendant's arrest. Apart from the alleged "loss" of the thumb drive, the State failed to disclose the Sundowner video's existence at any time in discovery, and failed, as well, to disclose Officer Gensen's conversations with the Tankersleys, conversations that would have revealed the existence of the video.

**{39}** As to the loss itself, the court found that "[t]he [FPD] either intentionally disposed of the thumb drive [of the Sundowner video] or at a minimum recklessly or grossly negligently lost it." The district court, moreover, found that the lead detective provided a "flawed" police report that claimed the FPD never collected the Sundowner video because it did not contain a clear vantage of the shooting; the court noted that this indicated either that the lead detective himself had viewed the Sundowner video or that he was being untruthful in light of the contrary testimony of Officer Gensen, who testified she had never looked at the video, and Jonathan Tankersley, who testified that the Sundowner video provided an unobstructed view of the shooting.

**{40}** Applying the *Harper* factors to the entire pattern of violations of its discovery orders, the district court characterized the violations as "continuing and egregious [d]iscovery and *Brady* violations" by the State. The court found a high degree of culpability by the State, even though the court fell short of labelling it as "bad faith."

## B.    Prejudice to Defendant

**{41}** The district court next considered prejudice to Defendant. The court found that the evidence on the missing thumb drive was material to Defendant's self-defense argument. The court found that the video evidence was material both to the subjective fear and objective reasonable person standard for using deadly force elements of Defendant's self-defense claim. The district court found that, in a case where Defendant's guilt "is highly equivocal," the Sundowner video "would have strengthened tremendously his self-defense argument."

## C.    Lesser Sanctions

**{42}** Last, the district court considered lesser sanctions. The district court had twice imposed lesser sanctions: First in its December 30, 2020, order compelling discovery and warning of greater sanctions if the State continued to fail to disclose relevant evidence in its possession. Next, the district court ordered the replacement of the entire prosecution team and suppressed evidence that had been wrongly obtained. Having found intentional and prejudicial violations of the court's discovery orders for the third time in the order on appeal, the district court considered whether admitting the contents of the thumb drive through witness testimony, and disclosing to the jury the State's culpable conduct in losing it, or merely excluding the Airport Auto video, the two remedies suggested in *Chouinard* for lost evidence, would be a sufficient sanction. The district court concluded that "[n]o other sanction would protect the [d]ue [p]rocess and

[f]air [t]rial [r]ights of . . . Defendant" given the highly material nature of the Sundowner video and the inability to recover it for trial.

**{43}** We find the court's assessment of each of the *Harper* and *Le Mier* factors to be eminently reasonable and to be supported by substantial evidence in the record. We, therefore, find no abuse of discretion in imposing the ultimate sanction of dismissal with prejudice.

**CONCLUSION**

**{44}** We affirm the dismissal of this case with prejudice.

**{45} IT IS SO ORDERED.**

**JANE B. YOHALEM, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**GERALD E. BACA, Judge**